NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Coos
No. 2013-0882

THE STATE OF NEW HAMPSHIRE

v.

CRAIG MICHAEL SANBORN

Argued: June 18, 2015
Opinion Issued: December 18, 2015

Joseph A. Foster, attorney general (Susan P. McGinnis, senior assistant attorney general, on the brief and orally), for the State.

Sisti Law Offices, of Chichester (Mark L. Sisti and Jared Bedrick on the brief, and Mr. Sisti orally), for the defendant.

LYNN, J. Following a jury trial in the Superior Court (Bornstein, J.), the defendant, Craig Michael Sanborn, was convicted on two counts each of manslaughter, RSA 630:2, I(b) (2007), and negligent homicide, RSA 630:3, I (2007), as the result of an explosion that killed two employees at his gunpowder factory. The court sentenced him to consecutive terms in the state prison on the manslaughter convictions only. On appeal, the defendant challenges, among other things, the manner in which the jury was selected, the sufficiency of the evidence, the verdict, and the sentences. Finding no error, we affirm.

The following evidence was presented at trial. The defendant, who was experienced in machine and tool design, engineering, and bullet manufacturing, approached Magkor Industries (Magkor) in 2005 or 2006 about manufacturing its patented gunpowder, Black Mag. His company, Black Mag LLC, in which the defendant owned a majority interest, contracted to manufacture the gunpowder. The defendant originally planned to produce the powder at a facility that he operated in Maine. However, Magkor officials visited that site and expressed concerns that the facility was too small and too close to other buildings. They discussed with the defendant the possibility of placing the machines used in the gunpowder manufacturing process outside, each in a separate "shipping container."[1]

Instead, the defendant rented a facility in Colebrook. The building in which the facility was located also housed a church and other businesses and was close to homes, offices, and an apartment complex. The defendant procured the necessary machinery for the gunpowder manufacturing facility, and was "in charge of production in the facility." He also had "full responsibility" for manufacturing.

Magkor's president, Giovanni Brus, testified that, in the pre-production phase, he gave the defendant safety specifications written by Magkor's explosives safety authority, Jerry Hall. These safety specifications included a diagram showing the proper layout for a facility producing the gunpowder. It also called for minimum distances between the machines, bunkering or barricading between the machines, and remote operation of the machines from a distance of 150 feet. Brus testified that the purpose of providing these safety specifications was "to make sure that whoever is subcontracted to produce the powder would realize the possible danger if they don't follow certain guidelines as far as the facility and production."

Peter Keddy, the defendant's electrician, installed electrical wiring at the facility in 2009. He testified that in an area that is dusty or where there are explosive vapors, an electrician would normally install wiring resistant to dust or explosive vapors. However, the defendant — himself a master electrician — told Keddy that, because of the type of ventilation system used, there would not be any hazardous debris or dust in the facility. Based upon these representations, Keddy used standard wiring. He also noticed that standard wiring, installed by someone else, existed throughout the facility and that there was a ceiling-mounted gas heater with an open flame in the area of the machines.

---

[1] The record does not further explain what is intended by the term "shipping container."

Magkor officials visited the Colebrook facility in the spring of 2009 and again in 2010, and each time expressed numerous safety concerns. At trial, Gregory Dixon, a Magkor stockholder with thirty years of experience in fireworks and explosives manufacturing, testified that he told the defendant "that the machines were too close together and [that] they needed to have barricades between them to separate them." He stated that the Magkor board of directors had discussed the safety issues and suggested, given the defendant's budgetary constraints, that he could at least place sandbag walls between the machines. That would be inexpensive and would provide "the minimal amount of safety." Dixon said that the defendant told him that he would obtain concrete blocks to form large barriers between the machines. Dixon also stated that he assumed "that everything would be remotely operated" by the time full production started.

Also in 2010, a chemist who had helped develop Black Mag gunpowder met with the defendant, pre-production, and discussed "separation, distance, barricading and remote operation." The chemist testified that as he discussed these requirements, the defendant "seemed to shrug it off," stating that the powder would merely "flash" in an ignition. The chemist stated that he warned the defendant that a small quantity might "flash," but that with a large quantity of powder, "you can't imagine how serious and how intense an explosion can be on a large scale." The defendant acknowledged that the recommended safety measures were necessary. The chemist followed up by sending the defendant a United States government report detailing Black Mag gunpowder's explosive properties.

In February 2010, the defendant's company received a large purchase order for Black Mag gunpowder that required delivery by May 17, 2010. Gearing up for production, the defendant applied for a license to store 1,000 pounds of powder at the facility. A bomb technician with the New Hampshire State Police, who inspected the facility as part of the application, testified that he informed the defendant that, by state statute, he could store only 50 pounds of powder. The technician thus denied the defendant's application. An officer in charge of reviewing application decisions testified that he contacted the defendant, at the technician's request, and the defendant urged him to grant the license. The officer told the defendant that he essentially was asking permission to store a "thousand-pound bomb." When the defendant insisted that the powder was not explosive but would merely flash, the officer disagreed and informed him that "a thousand pounds of flash powder would burn a person's shadow into the opposing wall." The defendant chuckled and replied, "Well, yeah, it would do that." The officer said there was "no way" he would grant the defendant a license, and he did not do so.

The defendant started production without a state license to store powder. He hired the victims, Donald Kendall and Jesse Kennett, as well as Mark Porter, to assist with manufacturing. Porter testified that the defendant did not

3

provide the employees with safety training or implement safety procedures. There were no written or oral safety policies or instructions about what to do in the event of an emergency, even though a fire marshal told the defendant that "employees should receive training in hazards, extinguishers, [and] emergency operations." Stephen Rook, an investigator with the United States Department of Labor, testified that, when he spoke with the defendant about safety procedures, the defendant told him that the facility did not have a safety compliance officer or a safety department. Employees did not wear protective clothing in hazardous areas, nor were there any warning signs posted. David Oldham, a supervisor at the defendant's facility, testified that the defendant told him and both victims that the powder "could ignite, [but] that it would not explode."

Porter testified that all of the production machines were located together in an area only 25 to 30 feet long, and that there were no materials positioned between the machines as barricades. Employees operated the machines without any formal training or manuals. Porter said he would "[j]ust follow the other guys." Employees used scoops to manually load the machines with powder while the machines were running. They also changed the speed and pressure dials during production. When compressed powder became stuck in the output chute, the defendant told Oldham to "[j]ust bang on it." Accordingly, employees would hit the chute with wooden dowels to make the compressed powder drop down. They also used a mallet to close the hatch door of a grinder. They stored "precursor" components and mixed powders in buckets and trash barrels in the same area as the machines. The employees did not remotely operate the machines; instead, they stood next to the machines to adjust speed. At best, employees could start the equipment from 12 feet away. If it was raining, employees smoked cigarettes inside the facility. Porter testified that he quit after just five-and-a-half days because, as he told the defendant, he thought it was dangerous to work there.

On May 14, 2010, the defendant was away at a trade show. He left Kendall, Kennett, and Oldham to produce gunpowder for the May 17 deadline. They had already made at least 800 pounds of gunpowder, which was stored in the grinding room, and Oldham testified that there was additional powder "all over the place, stored everywhere." One of the machines had short-circuited from a burnt wire, but Oldham rewired it and kept it operating after the defendant told him to do whatever was necessary to fix it. Oldham testified that, during that afternoon, Kendall and Kennett were both running powder through one of the machines. Kendall loaded the powder while Kennett tapped on the chute.

Oldham walked to a separate office to do work on a computer. Suddenly, Oldham heard a "rush of air" and the ceiling tiles "rippled, like a big wave." He looked out a window to the production area and could see nothing but a "really bright orange glow." He saw a flash and "felt a huge explosion" that knocked

4

him to the floor against a wall.  He fled the building to the parking lot and watched as explosions continued.  He stated that debris rained down "like a hail storm," "pounding the ground all around [him]."

Oldham survived the explosions and ensuing fire, but Kendall and Kennett did not.  Responders found their bodies 30 to 40 feet apart from each other.  An autopsy revealed that Kendall and Kennett suffered fatal injuries "from the explosion itself, from the blast, from objects flying at the time of the explosion, from their own bodies being thrown, and from a fire."  Given the damage to the facility, investigators could not identify exactly what event initiated the explosion.  Warren Parker, an expert in explosives, opined that, "to a degree of scientific certainty," the victims would not have been exposed to the injuries from which they died if they had been operating the machines remotely from a safe distance and in accordance with the safety diagram.

After the explosion, investigator Rook interviewed the defendant.  The defendant admitted that he had received the safety diagram prepared by Hall and that he knew he needed to properly space and barricade the machinery.  He also admitted that he provided no safety training to his employees but said he had planned to do so eventually.  He said that he had planned to one day implement remote operations.

The jury convicted the defendant on two counts of manslaughter and two counts of negligent homicide for causing the deaths of Kendall and Kennett.  The trial court sentenced the defendant to two consecutive state prison terms of 5-10 years on the manslaughter convictions; it did not impose sentences on the negligent homicide convictions.  This appeal followed.

II

On appeal, the defendant asserts numerous claims of error.  First, regarding jury selection, the defendant argues that the trial court erred by: (1) deviating from the statutorily prescribed process of selecting alternate jurors, thereby frustrating his ability to intelligently exercise his peremptory challenges; and (2) refusing to allow the attorneys to conduct their own voir dire of the jury venire.  Next, the defendant argues that there was insufficient evidence to prove, beyond a reasonable doubt, that he caused the victims' deaths because supervening accidents defeated the element of causation.  Regarding the verdict, the defendant argues that the trial court erred by: (1) undermining the purpose of the State's bill of particulars by failing to require the State to prove each allegation therein beyond a reasonable doubt; and (2) failing to require that the jury's verdict be unanimous as to the factual predicates of each offense, thereby depriving him of a twelve-member jury in violation of the State and Federal Constitutions.  Finally, the defendant argues that his state and federal protections against double jeopardy were violated when the trial court sentenced him on the more serious manslaughter

5

convictions rather than on the negligent homicide convictions.  We address each argument in turn.

III

Before jury selection, the trial court informed counsel that it would select the alternates randomly at the conclusion of trial.  Defense counsel requested an additional peremptory challenge "so that the proportionality of the [peremptories] is in keeping with the number of potential individuals that we'll be selecting."  Defense counsel further explained: "I think that the statute contemplates that the first 12 are the jury and that the Court may add alternates, but the three [peremptories] should be applied to the 12 that are intended to be sitting as the, quote, jury under the statute."  The trial court denied the motion, ruling the defendant was entitled to only three peremptory challenges and that it would select the alternates "randomly from the 14 who are selected."

The defendant contends that the trial court did not comply with RSA 500-A:13 (Supp. 2014), thereby frustrating his ability to intelligently exercise his peremptory challenges.  Specifically, he relies upon State v. Jaroma, 137 N.H. 562 (1993), in which we stated that "alternate jurors are generally selected prior to trial."  Jaroma, 137 N.H. at 569.  He argues that the trial court erred by failing to designate alternate jurors before the point in the selection process when the parties exercised their peremptory challenges.  Because the trial court did not select alternate jurors until the end of the trial, the defendant claims that he could not intelligently utilize his peremptory challenges by first striking from the panel jurors not seated as alternates and leaving for last those jurors less likely to participate in the deliberations.[2]

To resolve this issue, we must interpret RSA 500-A:13.  "The interpretation of a statute is a question of law, which we review de novo."  Favazza v. Braley, 160 N.H. 349, 351 (2010) (quotation omitted).  "In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole."  State v. Addison (Capital Murder), 165 N.H. 381, 418 (2013).  "We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used."  Id.  "Absent an ambiguity we will not look beyond the language of the statute to discern legislative intent."  Id.  "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language it did not see fit to include."  Id.  We interpret statutory provisions "in the context of the overall statutory scheme and not in isolation."  Id.

---

[2] We note that, on appeal, the defendant does not argue that he was entitled to additional peremptory challenges.

6

RSA 500-A:13 governs the selection, discharge, and impanelling of alternate jurors. It provides, in pertinent part, that "[t]he alternate jurors shall . . . [b]e sworn with and seated near the jury with equal opportunity for seeing and hearing the proceedings." RSA 500-A:13, II(a). The plain language of the statute requires the trial court both to swear in the alternates with the jury and to seat the alternates near the jury so that they may equally observe the proceedings. Nothing in the statute's plain language requires the court to distinguish or designate the alternate jurors from the regular jurors prior to swearing in the jury. Nor does the statute require that the alternates be designated before peremptory challenges, or give parties the right to have the alternates specifically identified prior to their exercise of peremptory challenges.

The defendant argues that Jaroma supports his contention that the trial court did not comply with the statute. In Jaroma, the defendant argued that he was denied his state and federal constitutional rights to a fair trial when the court "nonrandomly selected the jury foreperson and exempted that person from discharge as an alternate." Jaroma, 137 N.H. at 569. Thus, our analysis in Jaroma focused upon the trial court's selection of the jury foreperson. Id. at 569-70. In our analysis we also generally described the jury selection procedure that had occurred, noting that the judge informed the jury that he would select the alternate juror by lot, at the conclusion of the case. Id. at 569. We then stated that, "[a]lthough alternate jurors are generally selected prior to trial, the parties did not object to this procedure." Id. (citation and parenthetical omitted) (emphasis added). Unlike the instant case, in Jaroma we were not called upon to interpret the jury selection statute, and we did not do so. We merely noted that, at the time that case was decided, alternates generally were selected prior to trial, but we did not hold that such timing is mandated by the statute. Thus, Jaroma does not govern the result in this case.

Here, the alternate jurors were sworn and seated with the jury, as required by RSA 500-A:13, II(a). Accordingly, we reject the defendant's argument that the trial court did not comply with the statute.

IV

The defendant next argues that the trial court erred by refusing to allow the attorneys to conduct their own voir dire of the jury venire. "It is a fundamental precept of our system of justice that a defendant has the right to be tried by a fair and impartial jury." State v. Addison, 161 N.H. 300, 303 (2010) (quotation omitted). "Generally, a juror is presumed to be impartial." Id. "When a juror's impartiality is questioned, however, the trial court has a duty to determine whether the juror is indifferent." Id. "If it appears that any juror is not indifferent, the juror shall be set aside on that trial." Id. (quotation and brackets omitted).

The manner in which <u>voir dire</u> is conducted, and the choice of questions to be asked during <u>voir dire</u>, are "wholly within the sound discretion of the trial court." <u>Id</u>. (quotation omitted). <u>But see State v. Webster</u>, 166 N.H. 783, 795 (2014) (noting that capital and first-degree murder cases were exceptions to the general practice that <u>voir dire</u> was conducted solely by the trial judge).[3] "This court will not disturb the trial court's ruling absent an unsustainable exercise of discretion or a finding that the trial judge's decision was against the weight of the evidence." <u>Addison</u>, 161 N.H. at 303.

During jury selection, the defendant requested attorney-conducted <u>voir dire</u> because of the widespread publicity the case had received and concerns that the complexity of the case "created the potential for other latent biases not practicably discovered by court-led inquiry." The trial court, in denying the defendant's request, stated that its questions would be "more than adequate to ferret out any potential bias or impartiality." When the defendant continued to object, the court stated that "both the general <u>voir dire</u> and the thorough questioning that counsel [would] give particular jurors if they ha[d] concerns about the impartiality of any juror [would] suffice to impanel a fair and impartial jury." Additionally, after the defendant expressed concern about the incompleteness of the new juror questionnaires, the court stated that it would "certainly consider" allowing counsel to ask questions of jurors who did not answer their questionnaires as completely as counsel preferred.

The trial court read the indictments and the extensive witness list, and informed the potential jurors of the trial's start date and anticipated length. The court then gave the venire directions as to the responsibilities of a juror: to not begin deliberations until the trial is concluded; to not discuss the case among themselves or with anyone else; to not read, watch, or listen to any media coverage of the case; and to not make any effort to obtain information pertaining to the case. The court next informed the venire that it would ask a series of questions "to ensure that the jury that's finally chosen in this case is fair and impartial and objective and free from any preconceptions, biases, or prejudices of any kind." It then read a series of general <u>voir dire</u> questions.

Thereafter, the court asked a variety of specific questions, including whether potential jurors: (1) "kn[e]w anything about the facts" of the case or had "read or heard anything" about the case; (2) had "directly or indirectly given or formed any opinion about this case, the Defendant, the witnesses, the attorneys, or this type of case"; (3) had "heard anyone express an opinion about the Defendant, the witnesses, the attorneys, this case or this type of case"; (4) had any prejudice against the Defendant or involved parties; (5) had themselves, or a close family member, "ever been a victim of a crime such as

---

[3] We note that there is now a right to individual <u>voir dire</u> in criminal cases. RSA 500-A:12-a (Supp. 2014). However, because the statute was amended in 2014 — after the 2013 trial in this case — it is not relevant to our analysis.

8

the ones of which the Defendant is accused"; (6) had "any moral, religious, or personal convictions relative to this type of offense that might influence" their verdict; and (7) knew "of any reason whatsoever why [they could not] sit and hear the evidence in this case and render a true and honest verdict." The court then impaneled the jury.

The defendant argues that the court erred by refusing to allow attorney-conducted voir dire because such a process would have been more effective at ferreting out bias than court-conducted voir dire. We disagree. During jury selection, when either attorney had specific concerns regarding a particular juror, either the court or the attorneys posed supplemental questions to that juror. In fact, counsel directly questioned potential jurors on eleven separate occasions. Some of these exchanges were lengthy, allowing counsel to thoroughly explore their particular concerns with the potential juror. Thus, although the court did not allow the attorneys to exclusively conduct the voir dire, it afforded them numerous opportunities to question potential jurors. This thorough questioning demonstrates a careful and competent voir dire process. See State v. Stewart, 116 N.H. 585, 587 (1976) (concluding, upon review of the voir dire transcript, that the trial court acted carefully and competently in ensuring a fair and impartial jury).

As a result of this thorough questioning by both the court and counsel, the court excused twenty-nine potential jurors due to, among other reasons: familiarity with the facts or witnesses; the length of the trial being unduly burdensome; personal views; or having already formed an opinion about the case. The defendant did not challenge any of the seated jurors for cause, nor did he exercise all of his peremptory challenges. See State v. Smart, 136 N.H. 639, 651 (1993) ("[T]he defendant's satisfaction with [his] jury at the time of selection may be reflected in the fact that [he] did not employ all of the peremptory challenges available to [him], a fact relevant to a claimed lack of an impartial jury." (citation omitted)).

Based upon the trial court's detailed instructions regarding juror responsibilities, its case-specific voir dire questions to the venire, and the thorough questioning of individual jurors, we are convinced that the court's voir dire process was more than sufficient to ferret out any biases, including such as might arise from media coverage of the case, and to impanel a fair and impartial jury. Accordingly, we conclude that the trial court sustainably exercised its broad discretion over the voir dire process.[4]

---

[4] The defendant makes brief reference to a purported denial of his state and federal constitutional rights arising from the trial court's failure to allow attorney-conducted voir dire. This argument is not sufficiently developed to warrant our review and we decline to address it. See State v. Durgin, 165 N.H. 725, 731 (2013).

9

The defendant next contends that the trial court erred in denying his motions to dismiss and for a directed verdict. As a threshold matter, the defendant argues that the trial court denied his motions based upon its erroneous conclusion that the State could prove that he caused the victims' deaths without proving how the factory explosion occurred. In his view, in order to prove that he caused the victims' deaths, the State necessarily also had to prove how the explosion occurred and that he caused the explosion. We disagree.

Causation is an element of both manslaughter, see RSA 630:2, I, and negligent homicide, see RSA 630:3, I. "To establish causation, the State needed to prove not only that the prohibited result would not have occurred but for the conduct of the defendant, but also that the defendant's conduct was the legal (or proximate) cause of the prohibited result." State v. Lamprey, 149 N.H. 364, 366 (2003). Here, the State was required to prove, for each charged offense, that the defendant caused the prohibited result — the deaths of the two victims — not that he caused the explosion.

The defendant also argues that the trial court erred by not dismissing the charges or directing a verdict in his favor because there was insufficient evidence to sustain a conviction. He specifically contends that "no rational juror could have found that the . . . supervening accidents [which at trial he asserted may have occurred] did not break the causal link between [his] conduct and the deaths of his employees." The State disagrees, countering that the denial of both motions was proper "because the evidence demonstrated beyond a reasonable doubt that the victims would not have died if they had been remotely operating the equipment."

"When considering a challenge to the sufficiency of the evidence, we objectively review the record to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, considering all the evidence and all reasonable inferences therefrom in the light most favorable to the State." State v. Roy, 167 N.H. 276, 292 (2015) (quotation omitted). "It is the defendant who bears the burden of demonstrating that the evidence was insufficient to prove guilt." Id. (quotation omitted). "In reviewing the evidence, we examine each evidentiary item in the context of all the evidence, not in isolation." Id. (quotation omitted). "Further, the trier may draw reasonable inferences from facts proved and also inferences from facts found as a result of other inferences, provided they can be reasonably drawn therefrom." Id. (quotation omitted).

Circumstantial evidence can be sufficient to establish guilt beyond a reasonable doubt. Id. "[T]o prevail on a sufficiency of the evidence challenge when the evidence as to one or more elements of the charged offense is solely

circumstantial, the defendant must establish that the evidence does not exclude all reasonable conclusions except guilt." Id. (quotation and brackets omitted). "The proper analysis is not whether every possible conclusion consistent with innocence has been excluded, but, rather, whether all reasonable conclusions based upon the evidence have been excluded." Id. (quotation omitted). "The court does not determine whether another possible hypothesis has been suggested by [the] defendant which could explain the events in an exculpatory fashion." Id. (quotation omitted). "Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt." Id. (quotation omitted).

At trial, the State presented ample evidence that the defendant was aware of the risks to his employees: (1) the defendant acknowledged that he was supposed to have a safety officer and to implement safety policies, but did neither; (2) he knew that his employees were supposed to receive safety training and be instructed to wear protective equipment, neither of which occurred; (3) he was aware that he needed to barricade the machines to contain any type of incendiary incident, but he did not do so; (4) he understood that the machines were required to be at least 30 to 40 feet apart with barriers between them, which they were not; (5) he stored precursor components and buckets of mixed powders by the machines; (6) he did not take any of the necessary safety precautions even though he knew that the gunpowder was explosive once it was mixed in the grinders; (7) he misled employees about the explosive properties of powder, telling them that while it could ignite or spark, it would not explode; (8) he did not provide the employees training or manuals on how to operate the machines; (9) he acknowledged that the employees should have remotely operated the machines, but did not provide for remote operations as specified in Hall's diagram; (10) he had employees fill the machines and unload them while the machines were running; and (11) he had employees bang on one machine's metal chute, adjust its speed and pressure while it was running, and hit a grinder hatch with a mallet.

Despite being a master electrician, the defendant allowed the installation of both wiring that was not resistant to dust or explosive vapor, and a ceiling-mounted gas heater with an open flame. In addition, the State presented the testimony of Warren Parker, who was qualified as an expert in explosives. Parker was asked the following question:

> [T]o a degree of scientific certainty, had the men been operating according to the diagram, . . . a safe distance away from the machines, according to the remote operation requirements of the DOD and generally accepted safe standards, would they have been, in your opinion to a great degree of scientific certainty, . . . exposed to that violent explosive event on May 14, 2010?

In reply, he answered, "No, sir. Those distances are calculated precisely to prevent that type of injury."

The defendant points to what he contends are supervening occurrences that break the causal link between his acts and omissions and the deaths of the two victims: (1) a decedent's watch, found on the roof of the facility, that he alleges could have fallen into the machine; (2) the dial on one of the machines, found after the explosion, that showed a speed well above safe operating limits; (3) evidence showing that cigarette smoking might have taken place near combustible materials; and (4) the fact that the medical examiner could not definitively rule out whether one of the decedents had been operating the machinery under the influence of alcohol at the time of the explosion.

Based upon a review of the evidence as a whole, and viewed in the light most favorable to the State, we are not persuaded that, considered either individually or in combination, this evidence was sufficient to create reasonable doubt. We, therefore, reject the defendant's alternative hypotheses because we cannot conclude that they were sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. See Roy, 167 N.H. at 292 (explaining that the court does not determine whether another possible hypothesis could explain the event, but rather determines whether the hypothesis was sufficiently reasonable such that no rational juror could have found guilt beyond a reasonable doubt).

The evidence strongly supports the State's argument that, had the defendant required his employees to operate the machines remotely from a safe distance, neither victim would have been close enough to the grinder room to have suffered fatal injuries when the explosion and fire occurred. We also note that supervisor Oldham, who was not in the grinder room, survived the explosion and fires. Therefore, a rational jury could have concluded that, regardless of the specific cause of the explosion, the defendant's conduct was both the "but for" and proximate cause of the victims' deaths. Accordingly, we conclude that there is sufficient evidence to support the defendant's manslaughter convictions.

VI

The defendant argues that the trial court erred by failing to require the State to prove beyond a reasonable doubt every allegation in the bill of particulars it filed prior to trial. He alleges that he was prejudiced by this failure because it affected his ability to prepare an adequate defense and "vitiated the protection against double jeopardy ensured by the bill of particulars."

"A bill of particulars is, in this State, a tool for clarifying an inadequate indictment or complaint . . . ." State v. Chick, 141 N.H. 503, 506 (1996). "The

12

purpose of a bill of particulars is to protect a defendant against a second prosecution for an inadequately described offense and to enable him to prepare an intelligent defense." State v. French, 146 N.H. 97, 101 (2001) (quotation omitted). "[E]very allegation in a bill of particulars does not automatically become an element of the crime charged." Id. at 102. In addition to proving all the actual elements of the charged offense, "the State must prove beyond a reasonable doubt only those allegations in a bill of particulars which, if [at variance with the evidence at trial], would prejudice the defendant by surprising him at trial, impairing his ability to prepare a defense, or impairing his constitutional protection against double jeopardy." Id.

Before trial, the defendant moved to quash the indictments, alleging that they failed to place him on notice of the specific allegations against him. The State objected, arguing that it had that day filed a bill of particulars specifying facts upon which the indictments were based, thus enabling the defendant to avoid the possibility of double jeopardy. The particulars for the separate indictments were identical but for one distinction: those pertaining to the negligent homicide indictments used terms that indicated a negligent mental state, such as "failed to" or "neglected," while those pertaining to the manslaughter indictments did not. The following is the bill of particulars for the two negligent homicide and two manslaughter indictments, with the distinct manslaughter language appearing in brackets:

1. The defendant failed to/[did not] separate machinery used in manufacturing process as set forth in a distance chart provided by Magkor Industries, Inc.

2. The defendant failed to/[did not] place machinery in bunkers or provide a substantial barrier between each machine employed in the manufacturing process.

3. The defendant did not provide a means for remote operation of machinery used in the manufacturing process.

4. The defendant failed to/[did not] follow the manufacturing process specifications provided by Magkor Industries, Inc.

5. The defendant altered the manufacturing process specifications provided by Magkor Industries, Inc.

6. The defendant failed to/[did not] follow Black Mag LLC manufacturing process specifications.

7. The defendant misrepresented to employees that ignition of the product presented no risk of explosion and would only flash.

8. [ruled inadmissible][5]

9. The defendant failed to/[did not] eliminate or mitigate ignition sources in the areas set aside for the manufacturing process.

10. The defendant failed to/[did not] eliminate or mitigate ignition sources in the areas set aside for material and product storage.

11. The defendant failed to/[did not] implement employee safety protocols.

12. The defendant failed to/[did not] train employees so that they would understand and utilize the written manufacturing process specifications.

13. The defendant did not warn employees about the foreseeable risk of explosion.

14. The defendant failed to/[did not] protect employees from the foreseeable risk of explosion.

15. The defendant failed to/[did not] store and/or contain the product and/or its chemical components in a reasonably safe manner.

16. The defendant failed to/[did not] provide a safety officer on premises when employees were engaged in the manufacturing process.

17. The defendant failed to/[did not] analyze the risks inherent in the manufacturing process and take reasonable steps to remediate or eliminate them.

18. The defendant engaged in an ultra hazardous activity and failed to adopt a fail safe manufacturing process.

19. The defendant absented himself from the manufacturing facility after he had encouraged the employees to rush to complete an order.

---

[5] This particular related to an accident that occurred at the factory prior to the explosion on May 14, 2010.

20. The defendant neglected to/[did not] heed warnings of Magkor Industries, Inc. to bunker, separate and remotely control machinery.

The court denied the defendant's motion to quash the indictments. In so doing, it stated that, "the indictments and the bill of particulars, taken together . . . informed the defendant, in considerable detail and with sufficient specificity, of the defendant's alleged acts and omissions that caused the deaths of the two individuals."

Before the start of trial, the defendant requested that the State be required to prove each allegation in the bill of particulars beyond a reasonable doubt. When the State pointed out that one of the allegations had been ruled inadmissible, at the defendant's request, the defendant moved for dismissal. He argued that without the inadmissible allegation the State would be unable to prove its case, warranting dismissal. In response, the State moved to strike the bill of particulars, asking instead to "go forward on the indictments on their face." The court denied both the State's motion to strike the bill of particulars and the defendant's motion to dismiss, and decided that the bill of particulars should be read to the jury immediately after the indictments. The court did not, at that time, determine whether the State would be required to prove each allegation beyond a reasonable doubt.

The State submitted proposed jury instructions regarding the bill of particulars. These instructions reflected the State's position that the State did not need to prove every allegation in the bill of particulars beyond a reasonable doubt because the allegations were not elements of either set of offenses. The defendant responded that he had relied upon the particulars to determine what conduct the State was alleging had caused the explosion and, therefore, he would be prejudiced if the court did not require the jury to find each alleged particular beyond a reasonable doubt.

The trial court concluded that the State did not need to prove each allegation in the bill of particulars beyond a reasonable doubt. It found that the defendant "ha[d] not established . . . any specific variance between . . . the bill of particulars and the evidence" adduced at trial, had "not been surprised or otherwise prejudiced at trial," had "not been impaired in his ability to prepare a defense," and that "his constitutional protections against double jeopardy ha[d] not been impaired." The court then instructed the jury on the elements of manslaughter and negligent homicide. For manslaughter, the State had to prove, beyond a reasonable doubt, that the defendant had: (1) caused the death of another person; and (2) acted recklessly. For negligent homicide, the State had to prove, beyond a reasonable doubt, that the defendant had: (1) caused the death of another person; and (2) acted negligently. The court did not tell the jury that, in order to find the defendant guilty of any offense, it was required to find that the State had proved beyond a

15

reasonable doubt each of the allegations contained in the bill of particulars pertaining to the offense in question.

The defendant argues that the trial court's failure to require the State to prove each allegation in the bill of particulars "prejudiced [his] ability to prepare and execute a meaningful trial strategy and to protect him from double jeopardy." We disagree. None of the allegations was an enumerated element of either manslaughter or negligent homicide. See RSA 630:2, I; RSA 630:3, I; see also State v. Thresher, 122 N.H. 63, 70 (1982) (stating that "the State need not prove . . . the medically precise cause of death because [it is not] an element of murder" (citations omitted)). Rather, the alleged particulars merely provided details as to the manner, that is, the one or more ways, in which the enumerated element of the crimes — causing of the deaths of the victims — had been committed by the defendant. Because none of the alleged particulars was an element of any of the charged crimes, the court's failure to instruct the jury that the State must prove each allegation in the bill of particulars beyond a reasonable doubt does not, in itself, require automatic reversal. See French, 146 N.H. at 101 (allegations in a bill of particulars do not automatically become elements of the charged crime that the State must then prove).

Nonetheless, although the allegations in the bill of particulars were not elements of either offense, the court would have erred in not requiring the State to prove them if a failure to do so worked to the prejudice of the defendant. See French, 146 N.H. at 102. Here, we conclude that the trial court's decision did not prejudice the defendant. In ruling on this issue, the court found that the defendant had not shown any specific variance between the allegations in the bill of particulars and the facts proved at trial. See Kilgus, 128 N.H. at 585. This finding is supported by the record: the evidence adduced at trial aligned with the allegations in the bill of particulars. Because there was no variance between the allegations and the evidence presented at trial, the defendant's ability to prepare his defense was not impaired, nor was he subjected to prejudicial surprise. In fact, as the defendant asserts in his brief, he "defend[ed] against each and every allegation in the bill of particulars." We cannot conclude that actually defending against each allegation shows that the defendant's ability to prepare an adequate defense was impaired or that he was surprised at trial.

Neither can we conclude that the defendant's ability to later assert his constitutional protection against double jeopardy was impaired. N.H. CONST. pt. I, art. 16; U.S. CONST. amends. V, XIV; see State v. Fischer, 165 N.H. 706, 715 (2013) (stating that the Federal and State Constitutions "protect a defendant from being punished twice for the same offense"). The indictments here establish that the defendant has been placed in jeopardy for causing the deaths of the two victims, with various means detailed in the bill of particulars. The defendant was tried and convicted of causing the two deaths, and was sentenced for the manslaughter of the two victims. Thus, the defendant cannot

again be placed in jeopardy for causing the deaths of the same two victims. See State v. Doucette, 146 N.H. 583, 593 (2001) (stating that because the underlying crime of murder "was committed only once," the defendant "could have been convicted as an accomplice to this single crime only once, no matter how many of the different acts could support the conclusion that he 'solicited, aided, agreed or attempted to aid' in the murder").

For the foregoing reasons, we reject the defendant's argument that he was prejudiced by the trial court's decision not to require the State to prove each allegation in the bill of particulars beyond a reasonable doubt.

VII

The defendant next argues that he was deprived of a twelve-member jury when the trial court's instructions did not require the jury's verdict to be unanimous as to the factual predicates of the offenses. The State disagrees, arguing that the jurors had to be unanimous only in finding that the defendant caused the victims' deaths, not as to which particular acts caused their deaths. We agree with the State.

"The purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case." State v. Etienne, 163 N.H. 57, 70 (2011) (quotation omitted). "When reviewing jury instructions, we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case." Id. (quotation omitted). "We determine whether the jury instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law in the case." Id. (quotation omitted). "Whether a particular jury instruction is necessary, and the scope and wording of jury instructions, are within the sound discretion of the trial court, and we review the trial court's decisions on these matters for an unsustainable exercise of discretion." Id. (quotation omitted). "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." Id. (quotation omitted).

The court gave the following unanimity instruction:

In order to convict the Defendant of a criminal offense, the jury must unanimously agree that the Defendant committed the elements of the offense beyond a reasonable doubt. Unanimity, however, is required only as to the elements of the crime charged. The jury need not be unanimous as to the factual predicates as enumerated in the bill of particulars that the State assert[s] establish the elements of each offense.

17

"No person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt." RSA 625:10 (2007); Doucette, 146 N.H. at 592. "Jurors must be unanimous about what constitutes the essential culpable act committed by the defendant and prohibited by the statute." State v. Sleeper, 150 N.H. 725, 728 (2004). Here, to find the defendant guilty of manslaughter, the jury was required to agree unanimously that the State had proven the two elements of the crime beyond a reasonable doubt. First, the jury had to conclude that the defendant had the requisite mens rea, in that he acted recklessly. See RSA 630:2, I(b). Second, it had to conclude that the defendant caused the proscribed result, in that he caused the deaths of the victims. See RSA 630:2, I. As regards the negligent homicide charge, the jury was required to agree unanimously that the State had proven the two elements of that crime beyond a reasonable doubt: first, that the defendant acted with the requisite negligent mens rea; and second, that he caused the deaths of the victims. See RSA 630:3, I.

The defendant's argument in this case parallels that of the defendant in State v. Doucette, 146 N.H. 583. In that case, the defendant argued "that our holding in Greene, 137 N.H. [126, 128 (1993)], requires jury unanimity regarding the factual predicates that satisfy the elements, as well as unanimity on the elements themselves." Doucette, 146 N.H. at 592. The defendant "identifie[d] thirty-eight different acts in his brief, each of which could arguably have satisfied the element of 'solicit, aid, agree or attempt to aid.'" Id. He then argued that the jury "had to be unanimous on at least one such act in order to convict the defendant of second degree murder as an accomplice." Id. We disagreed, stating that the jury did not need to be unanimous as to the thirty-eight different acts because "there [was] no possibility that the defendant could have been convicted as an accomplice to the murder . . . thirty-eight different times." Id. at 593.

> The underlying crime, that is, the second degree murder of [the victim], was committed only once. Thus, the defendant could have been convicted as an accomplice to this single crime only once, no matter how many of the different acts could support the conclusion that he 'solicited, aided, agreed or attempted to aid' in the murder. Therefore, the jury needed to be unanimous only as to whether the defendant did, in fact, 'aid, agree or attempt to aid' in the murder, not as to the factual predicates which might establish this element.

Id.

As in Doucette, the defendant here could be convicted of causing the deaths of the two victims only once, no matter how many different acts supported the conclusion that he did so recklessly or negligently. As the State argues, "there is no possibility that the defendant could have been convicted of

18

causing the death of each victim [19] times based on the [19] separate acts and omissions" specified in the bill of particulars. Therefore, the jury in this case need not have been unanimous as to the underlying factual predicates supporting the element of causation, as long as they unanimously found both the requisite mental states and the proscribed conduct. See id.; cf. State v. Francoeur, 146 N.H. 83, 89 (2001) (unanimity not required as to whether the injury was caused by "shards of glass" or a "sharp-bladed object"); Sleeper, 150 N.H. at 728 (to secure a conviction for sexual assault under the pattern statute, the jury must "unanimously agree that a defendant engaged in more than one act of sexual assault as described in RSA 632-A:2 . . . but need not agree on the particular acts, provided that they find the requisite number of acts occurred during the statutory time period" (quotation omitted)).

Insofar as the defendant relies upon State v. Greene, 137 N.H. 126 (1993), as support for his argument, we note that it is questionable whether that case can be squared with our later unanimity cases. However, we need not definitively resolve that question. The Greene court confined its reasoning as to the need for juror unanimity to the specific "unprivileged physical contact" variant of simple assault at issue in that case. See Greene, 137 N.H. at 131; see also Doucette, 146 N.H. at 752-54. The offenses here are readily distinguishable from that at issue in Greene, and we therefore conclude that our analysis in Doucette controls the outcome in this case. We hold that the trial court sustainably exercised its discretion in declining to instruct the jury that it had to reach unanimous agreement as to the factual predicates of each offense.[6]

VIII

Finally, the defendant argues that the trial court violated the Double Jeopardy Clauses of the New Hampshire and United States Constitutions by sentencing him on the more serious manslaughter convictions rather than on the less serious negligent homicide convictions. See N.H. CONST. pt. I, art. 16; U.S. CONST. amends. V, XIV. We find no double jeopardy violation.

"The issue of double jeopardy presents a question of constitutional law, which we review de novo." State v. Ojo, 166 N.H. 95, 98 (2014). "Part I, Article 16 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution protect a defendant from being punished twice for the same offense." Fischer, 165 N.H. at 715; see N.H. CONST. pt. I, art. 16; U.S. CONST. amends. V, XIV. We first address the issue

---

[6] The defendant makes a passing argument that the trial court's unanimity instruction "vitiated the protection against double jeopardy ensured by the bill of particulars." Once again, because of the absence of any developed legal argument regarding this constitutional issue, we decline to address it. Durgin, 165 N.H. at 731.

under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

The trial court first instructed the jury on the negligent homicide indictments and then on the manslaughter indictments, separately explaining the elements of each offense. Once the jury returned from its deliberations, the court asked for its verdict on each indictment. The jury answered "Guilty" on each of the two counts of negligent homicide, and then answered "Guilty" on each of the two counts of manslaughter. At the defendant's request, the court polled the jurors with respect to the four verdicts, and the jurors all answered "Guilty" as to all four charges. The court sentenced the defendant on only the two manslaughter charges.

The defendant argues that his sentences on the manslaughter charges violate his constitutional protection against double jeopardy. Specifically, he relies upon State v. Baillargeon, 124 N.H. 355 (1983), to argue that the jury's verdict of guilty as to all charges was "unalterably ambiguous," thus entitling him to be sentenced on the lesser of the two crimes. Baillargeon, however, is readily distinguishable from this case. In Baillargeon, the court instructed the jury that it could convict the defendant of either second-degree murder or the lesser-included offense of manslaughter. Baillargeon, 124 N.H. at 358. When the jury was asked whether it found the defendant guilty or not guilty the foreman replied "'Guilty,' without specifying to which offense the verdict referred." Id. Neither the court nor counsel noted any ambiguity until the jury was discharged. Id. The defendant was then sentenced based upon "the assumption that he had been convicted of the more serious charge." Id. On appeal, we remanded the case on other grounds, but noted that the verdict was "unalterably ambiguous" because "the evidence could have supported a conviction for either offense, and there [was] nothing in the record to indicate which offense was meant." Id. at 359. We stated that with an unalterably ambiguous verdict, a conviction on the greater charge could not stand. Id.

Unlike in Baillargeon, the jury in this case was not instructed to choose between negligent homicide or manslaughter, but rather was told to consider each charge separately. Here, the jury reached and announced four separate guilty verdicts and specifically found the defendant guilty of two counts of manslaughter. Further, when the court polled the jury, each juror answered "Guilty" for all the verdicts. In contrast, in Baillargeon, the jury never specified to which of the alternate charges its guilty verdict referred. Id. at 358.

Despite these distinguishing facts, the defendant nevertheless suggests that the order in which the verdicts were returned — negligent homicide first, followed by manslaughter — created a similar ambiguity in this case. We disagree for several reasons. First, the jury was not instructed to deliberate on the verdicts, or return the verdicts, in any particular order. Second, although there can be no dispute that the negligent homicide charges were lesser-

20

included offenses of the manslaughter charges, the defendant did not request a lesser-included offense instruction, and the jury was not instructed to consider the manslaughter charges first and to deliberate as to the negligent homicide charges only if it found the defendant not guilty of the manslaughter charges. See State v. Soto, 162 N.H. 708, 718 (2011) (explaining usual manner of jury deliberations when lesser-included offenses are involved). Finally, there is no inconsistency between the defendant's convictions on the four discrete charges, particularly given that the jury's finding that the defendant acted with the more egregious mental state (recklessness) required for manslaughter also sufficed to satisfy the less egregious mental state (negligence) required for conviction of negligent homicide. See RSA 626:2, III (2007). Because we conclude that the verdicts were not unalterably ambiguous, the trial court did not err in sentencing the defendant on the more serious of the crimes of which he was convicted.[7]

Our analysis would be different had the trial court sentenced the defendant on both the manslaughter and negligent homicide charges. See State v. Farr, 160 N.H. 803, 809 (2010) ("[I]t violates double jeopardy to punish a defendant for both a lesser included and greater offense only if both derive from the same criminal act."). But the trial court did not sentence the defendant on the lesser-included negligent homicide offenses. The court, therefore, did not subject the defendant to multiple punishments for the same offense and, accordingly, his sentences do not violate the double jeopardy provisions of the State Constitution. "Because the Federal Constitution['s double jeopardy clause] provides no greater protection than the State Constitution under these circumstances, we reach the same result under the Federal Constitution as we do under the State Constitution." State v. Glenn, 167 N.H. 171, 179 (2014).

Affirmed.

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.

---

[7] We also note that although the defendant raises Baillargeon in the context of his double jeopardy arguments, we do not view that case as part of our double jeopardy jurisprudence. The portions cited by the defendant address only the need for specificity in jury verdicts. To the extent that Baillargeon is applicable to this case, the precedent is of no aid to the defendant because the jury's verdicts were unambiguous.

21